In re MINNESOTA UTILITY CONTRACTING, INC., and MUC Fleet Leasing & Sales, a Partnership, Debtors.

FIRST NATIONAL BANK IN ANOKA, a National Banking Association, Plaintiff,

v.

MINNESOTA UTILITY CONTRACTING, INC., Defendant.

FIRST NATIONAL BANK IN ANOKA, a National Banking Association, Plaintiff,

v.

MUC FLEET LEASING & SALES, a Partnership, Defendant.

Bankruptcy Nos. 4–88–1808, 4–88–1809. Adv. Nos. 4–88–177, 4–88–178.

United States Bankruptcy Court, D. Minnesota.

June 2, 1989.

Lawrence R. Johnson, Steffen & Munstenteiger, Anoka, Minn., for plaintiff/petitioner.

Michael B. LeBaron, Larkin, Hoffman, Daly & Lindgren, Ltd., Minneapolis, Minn., for defendant/respondent.

## MEMORANDUM ORDER

ROBERT J. KRESSEL, Chief Judge.

This proceeding came on for trial on the plaintiff's complaint under 11 U.S.C. § 363, and the defendants' counterclaims to avoid certain security interests under 11 U.S.C. §§ 544, 547, and 548. Lawrence R. John- son appeared for the plaintiff and Michael B. LeBaron appeared for the defendants. This court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, and Local Rule 103(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H), (K), (M) and (O). Based on the stipulated facts, the evidence presented at trial, the memoranda and arguments of counsel, and the file in these proceedings, I make the following memorandum order.

## FACTUAL BACKGROUND

Minnesota Utility Contracting, Inc. and MUC Fleet Leasing and Sales filed chapter 11 petitions on May 5, 1988.[1] At the time of filing, Charles R. Lundgren and Stanley D. Lebakken were the sole shareholders of Contracting and the sole partners of Leasing. Contracting installs underground cable for utility companies, particularly telephone and cable TV companies. Leasing leases construction equipment and vehicles. Contracting is Leasing's principal customer.

On January 6, 1984, the First National Bank of Anoka and Contracting entered into a revolving credit, term loan, and security agreement in which the Bank agreed to loan Contracting $1,586,000.00. The loan was secured by a mortgage on real estate in Anoka County, Minnesota, and a security interest in Contracting's accounts receivable, inventory, equipment, furniture, and fixtures. Financing statements covering Contracting's accounts receivable, inventory, equipment, furniture, and fixtures were filed in Minnesota and Wisconsin on January 11, 1984, and January 19, 1984, respectively.

On August 4, 1986, the Bank and Contracting entered into Supplement No. 1 to the Loan Agreement providing for an additional loan of $250,000.00. In this agreement, Contracting reaffirmed the security interests previously granted to the Bank. Contracting also granted the Bank a security interest in all inventory, accounts, equipment, and contract rights. On August 6,

---

1. Contracting voluntarily converted its chapter 11 case to a case under chapter 7 on May 17, 1989. Timothy D. Moratzka was appointed trustee in Contracting's case, thereby becoming the real party in interest in ADV 4–88–177.

1986, the Bank filed a financing statement in Minnesota covering Contracting's accounts receivable, inventory, equipment, and general intangibles.

On December 18, 1986, the Bank and Contracting entered into Supplement No. 2 to the Loan Agreement. This supplement modified the floor interest rate on the notes. Contracting again reaffirmed its security interests to the Bank.

On January 30, 1987, the Bank and Contracting entered into Supplement No. 3 to the Loan Agreement providing for the extension of maturity dates on certain notes. Contracting again reaffirmed its previously granted security interests. As of February 23, 1988, Contracting was indebted to the Bank in the approximate amount of $1,616,-265.00.

On February 23, 1988, the Bank and Contracting entered into Supplement No. 4 to the Loan Agreement providing for an additional loan of $250,000.00. Contracting again reaffirmed its security interests to the Bank. Until this transaction, all transactions had been strictly between the Bank and Contracting. However, this time, the Bank required that Leasing grant to the Bank a security interest in all Leasing's accounts, contract rights, inventory, equipment, furniture, and fixtures to secure both new and existing indebtedness of Contracting to the Bank.[2]

At the time of the filing of their chapter 11 petitions, Contracting and Leasing owned vehicles and equipment located, utilized and garaged in various states. Since that date, both Contracting and Leasing have been in possession of and using equipment, furniture, and fixtures subject to the Bank's security interest. At the time of filing, the debtors were also the owners of a large number of vehicles subject to certificates of title. The Bank's name appeared on applications for title or certificates of title to some, but not all these vehicles.

On June 13, 1988, the Bank initiated these two adversary proceedings. The complaint against Contracting alleged that Contracting, prior to the execution of a May 5, 1988, cash collateral agreement with the Bank, and without the consent of the Bank, sold certain assets which were subject to the Bank's security interest. The complaint further alleged that Contracting deposited the sale proceeds of $6,835.00 in its account without the knowledge, consent or endorsement of the Bank. The Bank asserted that Contracting converted the proceeds to its own use and benefit in violation of the cash collateral agreement. The Bank requested that the cash collateral agreement be declared null and void by reason of Contracting's violation of its terms, and sought payment of the $6,835.00 sale proceeds allegedly converted by Contracting.

Contracting filed a counterclaim asserting that the Bank failed to properly perfect its alleged security interest in motor vehicles and certain machinery and equipment owned by Contracting, and that, pursuant to § 544 of the Bankruptcy Code, the Bank's unperfected security interests were avoidable by Contracting as debtor in possession. Contracting also asserted that the Bank's filing of financing statements in connection with Contracting's machinery and equipment in Illinois, Florida and Arizona, on March 17, 22, and 23, 1988, respectively, constituted a preferential transfer avoidable by Contracting under § 547(b) of the Bankruptcy Code.

In its complaint against Leasing, the Bank asserted that Leasing, prior to the execution of the May 5, 1988 cash collateral agreement, sold certain assets which were subject to the Bank's security interest. The complaint alleged that except for three items, for which the Bank agreed to release its security interest in exchange for the payment of $21,000.00, all assets were sold

2. On March 3, 1988, a financing statement from Leasing was filed with the Secretary of State of Minnesota. On March 17, 1988, financing statements for Contracting and Leasing were filed in Illinois. On March 22, 1988, financing statements for Contracting and Leasing were filed in Florida. On March 23, 1988, financing statements for Contracting and Leasing were filed in Arizona. On April 27, 1988, financing statements for Contracting and Leasing were filed in Wisconsin. No financing statements for Contracting or Leasing were filed in California or Missouri.

without the Bank's consent. The Bank further asserted that the debtor converted $27,900.00 of the sale proceeds to its own use and benefit, in violation of the terms of the cash collateral agreement. Only one check in the amount of $12,322.50 was delivered to the Bank, which has held the check pending endorsement by Leasing. As in its complaint against Contracting, the Bank requested that its cash collateral agreement with Leasing be declared null and void, and sought payment of the $27,900 allegedly converted by Leasing.

Leasing filed four counterclaims, two of which are the same as those filed by Contracting. In addition, Leasing asserted that its grant to the Bank of a security interest in its accounts, contract rights, inventory, equipment, furniture and fixtures to secure the indebtedness of Contracting was an avoidable fraudulent transfer under § 548 of the Bankruptcy Code. Finally, Leasing asserted that the facts alleged in the complaint relating to the Bank's possession and retention of the $12,322.50 in sale proceeds constituted conversion of Leasing's funds.

At trial, I found that the cash collateral agreements were, by their own terms, effective for only forty-five days. Therefore, the Bank's request for rescission was clearly moot. I also found that the debtors breached the cash collateral agreements by failing to pay the Bank the proceeds of the asset sales. Accordingly, I ordered Contracting to pay $6,835.00 to the Bank and ordered Leasing to pay $27,900.00 to the Bank. I also ordered Leasing to endorse the $12,322.50 check held by the Bank. In all other respects, I ordered judgment for the defendants on the plaintiff's complaints. This order addresses only those issues raised by the debtors' counterclaims, except Leasing's fourth counterclaim concerning the Bank's alleged conversion of the $12,322.50 check. My order requiring Leasing to endorse the $12,322.50 check disposed of this counterclaim.

**3.** Subject to certain limitations, a debtor in possession has all the rights and powers of a trust-

Thus, left to be decided are the following:

1. Counterclaims by both defendants that the Bank's security interest in certain motor vehicles, machinery, and equipment is avoidable under 11 U.S.C. § 544;

2. Counterclaims by both defendants that the Bank's security interest in machinery and equipment perfected on March 17, 22, and 23, 1988, is avoidable under 11 U.S.C. § 547(b); and

3. The counterclaim by Leasing that the Bank's security interest in its assets is avoidable under 11 U.S.C. § 548.

## DISCUSSION

### I. Section 544

#### A. *Motor Vehicles*

Contracting and Leasing assert that they may avoid the Bank's unperfected security interests in certain motor vehicles under Bankruptcy Code § 544. Section 544(a) provides:

The trustee [3] shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists ...

11 U.S.C. § 544(a).

"The extent of the rights, remedies and powers of the trustee [or debtor in possession] as lien creditor are defined by the jurisdiction governing the property in question." *In re Martin*, 6 B.R. 827, 831 (Bktcy.C.D.Cal.1980), *citing Commercial Credit Co., Inc. v. Davidson*, 112 F.2d 54 (5th Cir.1940). Contracting owns motor ve-

ee. 11 U.S.C. § 1107(a).

hicles titled in Arizona and Minnesota. Leasing owns motor vehicles titled in Arizona, Florida, and Minnesota. Therefore, the debtors' power to avoid the Bank's security interests in the debtors' motor vehicles depends on the law of those three states.

Each of the three states has a statute which provides that an unperfected security interest is subordinate to the rights of a lien creditor. Ariz.Rev.Stat.Ann. § 47–9301 A.2; Fla.Stat. § 679.301(1)(b); Minn.Stat. § 336.9–301(1)(b). Since § 544(a)(1) grants the debtors in possession the powers of a lien creditor, they may avoid any unperfected security interests in the motor vehicles at issue.

■ "The determination of perfection of the security interest must be made by reference to state law." *In re Walters*, 61 B.R. 426, 429 (Bktcy.D.Mont.1986), *citing Palmer v. Radio Corp of America*, 453 F.2d 1133, 1138 (5th Cir.1971). Each of the states also has a statute which provides that the filing of a financing statement does not perfect a security interest in property subject to a certificate of title statute. Ariz.Rev.Stat.Ann. § 47–9302 C.2; Fla. Stat. § 679.302(3)(b); Minn.Stat. § 336.9–302(3)(b). Motor vehicles are subject to certificate of title statutes in all three states. Ariz.Rev.Stat.Ann. § 28–325; Fla.Stat. § 319.001 et seq.; Minn.Stat. § 168A.01 et seq. Accordingly, the Bank's filing of financing statements in Arizona, Florida, and Minnesota did not perfect its security interests in the motor vehicles owned by the debtors in possession.

In Arizona, the certificate of title to a motor vehicle must contain a statement of any liens or encumbrances existing against that vehicle. Ariz.Rev.Stat.Ann. § 28–325 C. If such a statement is not given, any security interest in the vehicle is invalid against lien creditors. Ariz.Rev.Stat.Ann. § 28–325 A. No reference to the Bank's security interest appears on certificates of title for the debtors' motor vehicles titled in Arizona. Hence, the Bank's security interests in those vehicles are avoidable by the defendants as debtors in possession in their status as judicial lien creditors.

Similarly, each lien or encumbrance on a motor vehicle titled in Florida must be noted on the face of the Florida certificate of title. Fla.Stat. § 319.27. No lien on a motor vehicle is valid unless evidenced in this way. Fla.Stat. § 319.20. The Bank's security interests were not noted on the face of either of the certificates of title to the motor vehicles titled in Florida. Hence, the Bank's security interests in those vehicles are avoidable by Leasing as debtor in possession in its status as a judicial lien creditor.

In Minnesota, no security interest in a motor vehicle is perfected until delivery to the registrar of motor vehicles of an application for a certificate of title containing the name and address of the secured party, if any, and the date of the secured party's security agreement. Minn.Stat. § 168A.17(2). This information was not furnished with the applications for certificates of title for some of the debtors' motor vehicles titled in Minnesota. Accordingly, the Bank's security interests in those vehicles are avoidable by the defendants as debtors in possession in their status as judicial lien creditors.

The Bank argues that it would be inequitable to allow the defendants to avoid the Bank's security interests in motor vehicles titled in Minnesota because it was the debtors' duty to disclose the security interests on the applications for certificates of title. Minn.Stat. §§ 168A.04(1)(3), 168A.10(2). This argument does not defeat the plain meaning of either Bankruptcy Code § 544(a)(1), which gives the debtors in possession the powers and rights of lien creditors, or the Minnesota statutes, which indicate that the Bank's security interests are unperfected and thus inferior to the rights of lien creditors. These laws serve the policy of protecting other creditors, who cannot be charged with notice of unrecorded security interests. Moreover, the Bank could have protected itself by insisting that it receive a copy of the certificates of title with its security interests noted before making any disbursements to the debtors, or by handling perfection of its security interests itself.

Accordingly, the Bank's security interest in the following motor vehicles owned by Contracting is void:

Vehicles titled in Arizona:

| Title No. | Make | Year |
|---|---|---|
| H4L6880710342 | GMC | 1982 |
| HAEB880530355 | Ford | 1983 |

Vehicles titled in Minnesota:

| Title No. | Make | Year |
|---|---|---|
| L10106220 | Chev | 1977 |
| L10606095 | Intl | 1976 |
| L13004198 | Chev | 1981 |
| L13406104 | Ford | 1973 |
| L16604097 | Chev | 1977 |
| L16604298 | Chev | 1982 |
| L16905529 | Intl | 1977 |
| L17203074 | JFWEQP | 1976 |
| L18004017 | Frue | 1969 |
| L18605184 | Ford | 1977 |
| L22406048 | Max | 1980 |
| L22406049 | Ford | 1980 |
| L25106227 | Chev | 1981 |
| L28005045 | Chev | 1978 |
| L30006087 | Ford | 1978 |
| M22507696 | Grdn | 1969 |
| M22507698 | GMC | 1981 |
| M30107565 | Hmde | 1962 |
| M30107612 | Fiat | 1977 |
| T01303067 | Chev | 1982 |
| T01304322 | Ford | 1979 |
| T06103201 | Ford | 1979 |
| T06501247 | Totem | 1965 |
| T10500095 | Ford | 1968 |
| T12701389 | WTC | 1981 |
| T14601309 | GMC | 1978 |
| T17700400 | Garco | 1968 |
| T24000073 | Ford | 1976 |
| T24501318 | Chev | 1978 |
| T26502223 | Ford | 1977 |
| T26701167 | Chev | 1979 |
| U25504181 | Chev | 1979 |
| Z36247001 | Chev | 1981 |

In addition, the Bank's security interest in the following motor vehicles owned by Leasing is void:

Vehicles titled in Arizona:

| Title No. | Make | Year |
|---|---|---|
| M86120 | Ford | 1980 |
| N177174 | Chev | 1986 |
| N214203 | Ford | 1979 |
| N219200 | Chev | 1974 |
| HAEB880750329 | Dakot | 1977 |
| HAEB880760358 | GMC | 1983 |

Vehicles titled in Florida:

| Title No. | Make | Year |
|---|---|---|
| 40669947 | Chev | 1984 |
| 43999582 | Chev | 1984 |

Vehicles titled in Minnesota:

| Title No. | Make | Year |
|---|---|---|
| J18107280 | BEI | 1982 |
| J18107377 | High | 1957 |
| L04407193 | DITC | 1973 |
| L05807203 | Chev | 1985 |
| L15306541 | Chev | 1984 |
| L16406154 | Ford | 1984 |
| L22103414 | Ford | 1978 |
| L22103446 | Ford | 1975 |
| L22303161 | Fort | 1970 |
| L23803312 | Hauler | 1978 |
| L24904224 | GMC | 1984 |
| L33606222 | Chev | 1981 |
| M30107564 | Owen | 1977 |
| M30207256 | Ford | 1981 |
| V26906692 | Ditw | 1978 |
| X20705282 | Chev | 1981 |
| X20705296 | Ford | 1978 |
| X20705549 | Ford | 1978 |
| X21005327 | Ford | 1978 |
| X21005330 | Ford | 1976 |
| X21005332 | Ford | 1974 |
| X21005335 | Theu | 1968 |
| X21005336 | Util | 1973 |
| X21005338 | Chev | 1982 |
| Z23107011 | Ford | 1979 |

### B. *Other Allegedly "Mobile Goods"*

Contracting and Leasing further assert that the Bank's security interest in certain property located in California and Missouri was unperfected and, hence, avoidable under § 544(a)(1).

As of May 5, 1988, the date the debtors' petitions were filed, the debtors owned property located in Arizona, California, Florida, Illinois, Minnesota, Missouri, and Wisconsin. The Bank filed financing statements in Minnesota, Wisconsin, Illinois, Arizona, and Florida with respect to this property. The Bank never filed financing statements in California or Missouri.

The Bank asserts that its security interests in property in California and Missouri are perfected even though no financing statements were filed in those states. The Bank argues that the property in California and Missouri constitutes mobile goods, that a security interest in mobile goods is perfected in the state where the debtor is

located rather than the state where the goods are located, and that, since the debtors are located in Minnesota, the Bank's security interest in goods in California and Missouri was perfected by the Bank's filing of financing statements in Minnesota.

As noted, perfection is determined by state law. *In re Walters,* 61 B.R. 426, 429 (Bktcy.D.Mont.1986), *citing Palmer v. Radio Corp of America,* 453 F.2d 1133, 1138 (5th Cir.1971). California, Minnesota, and Missouri have all adopted U.C.C. 9–103(3). Cal.Com.Code § 9103(3) (West); Minn.Stat. § 336.9–103(3); Mo.Rev.Stat. § 400.9–103(3). Under 9–103(3), goods are perfected according to law of the state in which the debtor is located if they are mobile and

> of a type normally used in more than one jurisdiction, such as motor vehicles, trailers, rolling stock, airplanes, shipping containers, road building and construction machinery and commercial harvesting machinery and the like, if the goods are equipment or are inventory leased or held for lease by the debtor to others, and are not covered by a certificate of title ...

*Id.*

■ The words "of a type normally used in more than one jurisdiction" could mean property normally used in more than one jurisdiction by the particular debtor, or property of a type normally used in more than one jurisdiction by all persons, based on the type of goods, not the debtor's use. The latter meaning is more consistent with the language and purpose of 9–103. Since the language of the statute does not limit the persons whose use is to be considered, I think the use of the same type of goods by persons in general is at issue.

Moreover, secured parties and third parties need to know whether perfection is governed by the law where the debtor is located, or by the law where the collateral is located. These parties cannot be expected to know whether a particular debtor normally moves goods of a certain type from one jurisdiction to another. They can, however, be expected to know the nature of their collateral and ordinary business practice regarding the movement of that property, so general business practice should determine whether the goods are of a type normally used in more than one jurisdiction.

■ The party arguing for the applicability of a law bears the ultimate burden of proving the existence of the facts which must exist before such law is applied. *In re American Provision Co.,* 44 B.R. 907, 909 (Bktcy.D.Minn.1984). The Bank is arguing that 9–103(3) applies in this case. In order for 9–103(3) to apply, the collateral must be of a type normally used in more than one jurisdiction. The Bank therefore has the burden of proving that the collateral is of a type normally used in more than one jurisdiction.[4]

■ The evidence introduced at trial was insufficient to enable me to determine whether the goods owned by the debtors in California and Missouri were "of a type normally used in more than one jurisdiction" by persons using the same type of goods. Therefore, the Bank failed to meet its burden of proving that the debtors' goods were mobile goods, and may not rely on 9–103(3). Accordingly, the Bank's filing of financing statements in Minnesota did not perfect its security interests in the defendants' property in California and Missouri.

Under the law of both California and Missouri, lien creditors may avoid unperfected security interests. Cal.Com.Code § 9301(1)(b) (West); Mo.Rev.Stat. § 400.9–301(1)(b). The Bank never filed financing statements in California or Missouri. Hence, the Bank's security interests in the defendants' property in California and Missouri are unperfected, and the defendants as debtors in possession may avoid those unperfected security interests. Accordingly, the Bank's security interest in

---

**4.** Because the issue is whether the debtors' goods are of a type normally used by the community in general in more than one jurisdiction and not whether they are of a type normally used by the debtors in more than one jurisdiction, the debtors do not have unique knowledge of the facts at issue.

the following property owned by Contracting is void:

Property located in California

| Item | Description |
|------|-------------|
| 57153 | HYD POWER UNIT FIBER 0 |
| 57156 | FIBER PULLING FIG 8 SH |
| 57157 | FIBER PULLA |
| 57158 | FIBER SPLICE |
| 57159 | ARNCO FIBER TESTER |
| 97295 | PELSYE ELECT, BLOWER–1 |
| 97297 | MOPACO BLOWER 12 VOLT |

Property located in Missouri

| Item | Description |
|------|-------------|
| 15202 | 82 475 CASE PLOW 07051 |
| 23744 | 1987 JD 210/37608 |
| 23748 | 1987 JD 210/38195 |
| 39245 | 1981 4″ HOLE HOG 1000 |
| 39252 | 83 Hog 3000 3inch |
| 39270 | 5 INCH HOLE HOG |
| 53111 | 83 IR COMPRESSOR 12129 |
| 63747 | 82 GMC DUMP 560868/PRU |
| 63750 | 82 GMC DUMP 561107/PRU |
| 75338 | 82 CH Crewcab 100278/N |
| 75712 | 84 FD F250 A86456/RAZ1 |
| 83141 | 76 HOMEMADE 3AXL 76401 |

In addition, the Bank's security interest in the following property owned by Leasing is void:

Property located in California

| Item | Description |
|------|-------------|
| 94001 | MOTOROLA HT90 SN# 1217 |
| 94002 | MOTOROLA HT90 SN# 1218 |
| 94003 | MOTOROLA HT90 SN# 1219 |
| 94004 | MOTOROLA HT90 SN# 1220 |

Property located in Missouri

| Item | Description |
|------|-------------|
| 31249 | CASE TRACK TRENCHER 155821 |
| 75340 | 85 FORD 3/4 TON 4 × 4 |

## II. Section 547

Contracting and Leasing argue that the Bank's security interests in the debtors' machinery and equipment was preferential and may be avoided under § 547 of the Bankruptcy Code. Section 547 provides in relevant part:

. . . . .

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition;

(B) within ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

All five elements must be satisfied before a transfer of an interest of the debtor in property may be avoided as preferential.

### A. Leasing's Grant of a Security Interest to the Bank

█ In order to be avoided as a preference, a transfer must be made "for or on account of an antecedent debt owed *by the debtor*." 11 U.S.C. § 547(b)(2) (emphasis added). Leasing's transfer to the Bank of a security interest in its property was not made for or on account of an antecedent debt owed by *Leasing*. Instead, the transfer was made for or on account of an antecedent debt of *Contracting*. Therefore, Leasing's transfer of a security interest in its property to the Bank was not a preference.

### B. Contracting's Property in Minnesota and Wisconsin

Section 547(b) requires that a transfer must be made on or within 90 days before the date of the filing of the petition, or within one year of filing if the creditor was an insider. 11 U.S.C. § 547(b)(4). For purposes of § 547, a transfer is made at the time it is perfected, if perfected after ten days from the time the transfer takes ef-

fect between the transferor and the transferee. 11 U.S.C. § 547(e)(2).

■ The Bank's security interest in Contracting's property in Minnesota and Wisconsin (other than motor vehicles) was perfected in Minnesota on January 11, 1984, and in Wisconsin[5] on January 19, 1984. Therefore, the security interest in Contracting's property in those states was transferred in 1984. Contracting filed its petition on May 5, 1988. Since Contracting transferred the security interests in its property in Minnesota and Wisconsin to the Bank more than four years before the filing of Contracting's petition, these transfers were not preferences.

### C. Contracting's Property in Illinois, Florida, and Arizona

■ Contracting's transfers to the Bank of security interests in Contracting's property in Illinois, Florida, and Arizona were preferential under § 547(b). Those security interests were granted to the Bank, a creditor of Contracting. The transfers were made as security for antecedent debts owed by Contracting.[6] The transfers were made while Contracting was insolvent.[7] The Bank's security interest in Contracting's property in Illinois, Florida, and Arizona was perfected when the Bank filed financing statements in Illinois on March 17, 1988, in Florida on March 22, 1988, and in Arizona on March 23, 1988.[8] Therefore, the security interests in property in those states were granted on those three dates,

all within 90 days before Contracting's petition was filed on May 5, 1988. Finally, the transfers allowed the Bank to receive more than it would have received in a chapter 7 liquidation, absent the transfer. The grants to the Bank of security interests in Contracting's property in Illinois, Florida, and Arizona would have allowed the Bank to dispose of this property and use the proceeds to satisfy Contracting's indebtedness to the Bank exclusively. In the absence of those transfers, in a case under chapter 7, the proceeds of the disposition of this property would be shared among all Contracting's general unsecured creditors. The transfers therefore allowed the Bank to receive more than the Bank would have received in a chapter 7 liquidation in the absence of the transfer.

All of the elements of a preferential transfer, as listed in § 547(b), are present. However, a transfer is not avoidable if any one of the affirmative defenses listed in § 547(c) applies. The Bank asserts that § 547(c)(1) is applicable. Under that subsection, a transfer may not be avoided if the parties intended it to be a contemporaneous exchange for new value given to the debtor, and it was in fact a substantially contemporaneous exchange. 11 U.S.C. § 547(c)(1).

Because the Bank made loans to Contracting over a four year period, the facts relevant to whether the loans were intended to be, or actually were substantially contemporaneous to the transfer of the se-

---

5. Contracting does not own any motor vehicles titled in Wisconsin.

6. Debts are antecedent under 547(b)(2) if incurred before the transfer in question. *In re AOV Industries*, 85 B.R. 183, 185 (Bktcy.D.D.C. 1988). Debts are incurred upon the performance giving rise to the debt, not when payment is due. *In re Western World Funding, Inc.*, 54 B.R. 470, 477 (Bktcy.D.Nev.1985). In this case the performance consisted of the loans the Bank made to Contracting, the most recent of which was made on February 23, 1988. The security interests were granted when perfected, on March 17, 22, and 23 of 1988. Since Contracting's debts were incurred before it transferred the security interests, the debts are antecedent.

7. For purposes of § 547, the debtor is presumed to have been insolvent during the 90 days immediately preceding the filing of the bankruptcy

petition. 11 U.S.C. § 547(f). Since Contracting's petition was filed on May 5, 1988, Contracting is presumed to have been insolvent when the security interests were granted on March 17, 22, and 23 of 1988. The Bank offered no evidence to rebut this presumption.

8. The Bank argued that Contracting's property constituted mobile goods, and hence, its security interest was perfected by its filing in Contracting's location, Minnesota. As was the case with Contracting's property in California and Missouri, however, the Bank did not meet its burden of proving that the goods were of a type normally used in more than one jurisdiction, and therefore, may not rely on the mobile goods rule of perfection.

curity interest are not common to all the loans. Accordingly, I will address the facts of each loan separately.

### 1. February 23, 1988, Loan

Section 547(c)(1) does not apply to the loan made on February 23, 1988. This loan was not intended to be exchanged contemporaneously with the security interest. Rather, the security interest was intended to be granted at the time the security agreement was executed on January 6, 1984. Nor was the February 23, 1988 loan in fact part of substantially contemporaneous exchange. Ordinarily, a security interest must be perfected within ten days of a cash advance for the transfer of the security interest to be substantially contemporaneous under § 547(c)(1)(B).[9] The security interests were perfected in Illinois, Florida, and Arizona on March 17, 22, and 23 of 1988, respectively. The security interests were not perfected in these states within ten days of the February 23, 1988 advance. Therefore, the transfers were not substantially contemporaneous exchanges for the loan.

### 2. August 4, 1986, Loan

Section 547(c)(1) is not applicable to the loan made on or around August 4, 1986. This loan was not intended to be exchanged contemporaneously with the security interest, which also was intended to be granted when the security agreement was executed on January 6, 1984. This loan was not in fact part of substantially contemporaneous exchange, since the security interest was not perfected in Illinois, Florida, and Arizona until long after the loan was made.

### 3. January 6, 1984, Loan

■ Finally, § 547(c)(1) is not applicable to the loans made on or around January 6, 1984. These loans were intended to be exchanged contemporaneously with the se-

curity interest, since the security interest was intended to be granted on January 6, 1984, when the security agreement was executed. However, because the security interest was not perfected in Illinois, Florida, and Arizona until 1988, the exchange was not, *in fact*, substantially contemporaneous.

No other exceptions to § 547(b) apply, so as to prevent Contracting from avoiding the preferential transfers to the Bank. Section 547(c)(4) makes an exception for transfers in which the creditor has given new value to the debtor, but the new value must have been given after the allegedly preferential transfer. 11 U.S.C. § 547(c)(4). Because of its delayed perfection, all of the Bank's loans to Contracting occurred before Contracting's transfer to the Bank of the security interest in its property in Illinois, Florida, and Arizona.

Contracting, as a debtor in possession, may avoid the transfers to the Bank of security interests in Contracting's Illinois, Florida, and Arizona property. All the elements of § 547(b) have been established. None of the exceptions listed in § 547(c) apply. Therefore, the Bank's security interest in Contracting's property in Illinois, Florida, and Arizona is void.

### III. Section 548(a)(2)

■ Leasing asserts that its transfer to the Bank of a security interest in all Leasing's assets to secure the indebtedness of Contracting constitutes a fraudulent conveyance avoidable under § 548(a)(2) of the Bankruptcy Code. That section provides in relevant part:

(a) the trustee [10] may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or

---

**9.** The basis for this rule is § 547(c)(3). That section prevents the avoidance of purchase money security interests which are perfected within ten days of the debtor receiving possession of the property which the secured loan enabled the debtor to acquire. If a secured party could use § 547(c)(1) to prevent the avoidance of its security interest without perfecting within ten days of the loan, § 547(c)(3) would be superfluous. Curing this defect by making the prevention of avoidance without perfection

within ten days inapplicable to purchase money security interests would create an anomaly, since purchase money security interests are generally favored over other security interests. *Ray v. Security Mutual Finance Corp.* (*In re Arnett*), 731 F.2d 358 (6th Cir.1984); *Bergquist v. Cessna Finance Corp.* (*In re A.E.F.S.*), 39 B.R. 66 (Bktcy.D.Minn.1984).

**10.** See note 3.

within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

    (2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

    (B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation. . . .

11 U.S.C. § 548(a)(2). Accordingly, a transfer is avoidable under § 548(a)(2) if:

    (1) there was a transfer of an interest of the debtor in property;

    (2) the transfer was made within one year before the date of the filing of the petition;

    (3) the debtor received less than a reasonably equivalent value in exchange for the transfer; and

    (4) the debtor was insolvent on the date the transfer was made.

The burden of proving each of these four elements is on the trustee or debtor in possession. *Baddin v. Olson (In re Olson)*, 66 B.R. 687, 694 (Bktcy.D.Minn.1986). The trustee or debtor in possession must prove each element by a preponderance of the evidence. *Zimmerman v. Saviello (In re Metro Shippers, Inc.)*, 78 B.R. 747, 751 (Bktcy.E.D.Pa.1987).

Leasing's grant of a security interest in all its assets to the Bank to secure MUC's $1.8 million debt to the Bank was a "transfer of an interest of the debtor in property." "Transfer" is broadly defined by the Code as:

every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption.

11 U.S.C. § 101(50). Leasing's grant to the Bank of a security interest in all partnership accounts receivable, vehicles, contract rights, equipment, machinery, furniture and fixtures falls squarely within this definition. The transfer occurred on February 23, 1988, within one year before the filing of Leasing's chapter 11 petition on May 5, 1988. Therefore, the only issues remaining under § 548(a)(2) are whether Leasing was insolvent on the date the transfer was made, and whether Leasing received less than reasonably equivalent value in exchange for its pledge of assets to the Bank.

### A. *Insolvency*

Section 101(31) defines the insolvency of a partnership as:

    (B) . . . financial condition such that the sum of such partnership's debt is greater than the aggregate of, at a fair valuation—

      (i) all of such partnership's property, exclusive of property of the kind specified in subparagraph (A)(i) of this paragraph; and

      (ii) the sum of the excess of the value of each general partner's nonpartnership property, exclusive of property of the kind specified in subparagraph (A) of this paragraph, over such partner's nonpartnership debts . . .

Subparagraph (A) of section 101(31) refers to:

    (i) property transferred, concealed, or removed with intent to hinder, delay or defraud such entity's creditors; and

    (ii) property that may be exempted from property of the estate under section 522 of this title . . .

Leasing provided the following liquidation analysis as of February 23, 1988:

| | |
|---|---|
| Leasing Assets | $222,616 |
| Leasing Liabilities | (387,719) |
| Leasing Net Worth | (165,103) |
| Adjustment for Partners' Net Worth | 76,909 [11] |
| Net Worth | ($88,194) |

**11.** The partners' net worth of $76,909 was calculated by deducting from their "gross net worth" the following:

    1. the value of Contracting stock and Leasing interests;

    2. the value of all applicable state law exemptions; and

    3. the partners' spouses' ½ interest in the remaining unsecured assets.

This analysis was based on Leasing's balance sheet as of February 29, 1988,[12] without adjustment for its pledge of assets to the Bank to secure the obligations of Contracting. Thus, Leasing was insolvent at the time it granted its security interest to the Bank.

Even if Leasing was not already insolvent, Leasing would have been rendered insolvent as a result of its February 23, 1988, grant of a security interest to the Bank. Leasing's grant of a security interest in all its assets to the Bank created a partnership debt.[13] Under § 548(a)(2)(B)(i), a transfer is avoidable if the debtor "was insolvent on the date the transfer was made ... *or became insolvent as a result of such transfer.*" 11 U.S.C. § 548(a)(2) (emphasis added). Therefore, the partnership debt created by the transfer must be included with all other partnership liabilities in determining whether Leasing was insolvent as a result of the transfer. Assuming that Leasing's pledge of assets created a partnership debt at least equal to the amount of Contracting's debt to the Bank on February 23, an additional $1,866,265.00 must be added to Leasing's other liabilities of $387,719.00. Accordingly, Leasing's liabilities after the transfer were at least $2,253,984.00.

Section 101(31) includes in the calculation of a partnership's insolvency all general partners' nonpartnership property except property transferred with intent to hinder, delay or defraud and exempt property.

Lundgren's and Lebakken's stock in Contracting is nonpartnership property. It was neither transferred with intent to hinder, delay or defraud creditors nor exempted. Hence, the value of the partners' respective interests in Contracting stock, listed on each of their individual financial statements as $100,000, must be included in the calculation of their nonpartnership assets.

Given these adjustments, Leasing's financial condition following its pledge of assets to the Bank on February 23, 1988, is calculated as follows:

| | |
|---|---|
| Partnership Assets | $ 222,616 |
| PLUS: Excess of Partners' Nonpartnership Assets Over Nonpartnership Liabilities | 276,909 |
| Total Assets | $ 499,525 |
| LESS: Partnership Liabilities | (2,253,984) |
| Partnership Net Worth | ($1,754,459) |

Therefore, Leasing was insolvent at the time of or was rendered insolvent by the grant of the security interest to the Bank. The only remaining issue is whether Leasing received reasonably equivalent value.

### B. *Reasonably Equivalent Value*

Whether a transfer is made for reasonably equivalent value is a question

---

**12.** No material change in Leasing's financial condition occurred between February 23, 1988, and February 29, 1988.

**13.** "Debt" is defined in Bankruptcy Code § 101(11) as "liability on a claim." 11 U.S.C. § 101(11). "Claim" is defined in § 101(4) as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(4). Leasing pledged its assets "to secure payment to the Bank ... of all notes of [Contracting] ... delivered or purchased or otherwise acquired by the Bank and all other liabilities and indebtedness of [Contracting] to the Bank, due or to become due ... now existing or hereafter at any time created ..." *See also* 11 U.S.C. § 1111(b)(1)(A), which provides:

A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse ...

and 11 U.S.C. § 502(b)(1), which provides:

(b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—

(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured ...

of fact to be determined in light of the facts presented in each particular case. *Jacoway v. Anderson* (*In re Ozark Restaurant Equipment Co., Inc.*), 850 F.2d 342 (8th Cir.1988); *Kjeldahl v. United States* (*In re Kjeldahl*), 52 B.R. 926, 934 (Bktcy.D.Minn.1985). However, "[t]he determination of 'reasonably equivalent value' is not a science, but an art. It does not require an exact balancing of both sides of an exchange. It requires only some exchange which is 'fair'". *Causeway Corp. v. Gull Advisors, Inc.*, No. 5–86–26, slip op. at 35 (Bktcy.D.Minn., July 31, 1987). In making this determination, "[t]he court may employ for its guidance any comparative formula or combination of formulas it deems appropriate while carefully considering whether the analysis employed fully recognizes the relevant factors and protects the interests of the parties." *Joing v. O & P Partnership*, 82 B.R. 495, 499 (D.Minn.1987).

■ In general, transfers made or obligations incurred solely for the benefit of third parties do not furnish reasonably equivalent value. *Ear, Nose and Throat Surgeons of Worcester, Inc. v. Guaranty Bank and Trust Co.* (*In re Ear, Nose and Throat Surgeons of Worcester, Inc.*), 49 B.R. 316 (Bktcy.D.Mass.1985). This rule is based on the rationale that:

> if the debt secured ... is not the debtor's own, then his giving of security will deplete his estate without bringing in a corresponding value from which his creditors can benefit, and his creditors will suffer just as they would if the debtor had simply made a gift of his property or obligation.

*Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir.1981). This is essentially a balance sheet test. If a transfer adversely affects one side of the debtor's balance sheet, then the debtor's balance sheet must reflect a consideration already received of reasonably equivalent value or the transaction must result in a change to the other side of the balance sheet of reasonably equivalent value.

■ Leasing met its burden of showing it received no direct benefit from its grant of a security interest to the Bank. It is undisputed that the $250,000.00 advance by the Bank on February 23, 1988, was paid to Contracting. However, the Bank asserts that its $250,000.00 loan to Contracting indirectly benefitted Leasing. The Bank further asserts that this indirect benefit constituted value reasonably equivalent to the security interest transferred by Leasing.

A number of cases recognize that indirect benefit to the transferor may be sufficient to establish reasonably equivalent value. *See, e.g., Rubin*, 661 F.2d at 991; *Ear, Nose and Throat Surgeons*, 49 B.R. at 320. In a case decided under § 67(d)(2) of the repealed Bankruptcy Act, providing for avoidance of conveyances made without "fair consideration," the *Rubin* court acknowledged that consideration given to a third person which confers an "economic benefit" on the debtor may establish fair consideration. *Rubin*, 661 F.2d at 991. Reasonably equivalent value may also be found where the debtor and the third party "are so related or situated that they share an 'identity of interests,' because what benefits one will, in such case, benefit the other to some degree." *Garrett v. Falkner* (*In re Royal Crown Bottlers of North Alabama, Inc.*), 23 B.R. 28, 30 (Bktcy.N.D. Ala.1982).

I will accept the Bank's legal argument that indirect benefit may, under the right circumstances, constitute reasonably equivalent value under § 548(a)(2). However, I find that the Bank's argument, as a departure from traditional concepts of reasonably equivalent value, is in the nature of an affirmative defense. Hence, the burden of proof is on the Bank to establish that Leasing received "reasonably equivalent value." As the court stated in dicta in *Garrett v. Falkner* (*In re Royal Crown Bottlers of North Alabama, Inc.*), 23 B.R. 28, 31 (Bktcy.N.D.Ala.1982) (emphasis added):

> Perhaps this particular burden [of establishing the value or lack of value of an indirect benefit] should not be upon the trustee, once it has been established that the direct consideration for the debtor's transfer did not go to it, but to a third party. *It is not unreasonable to find*

*that the insolvent debtor's transferee should have the burden of demonstrating that the debtor's estate was not harmed by the transfer of the insolvent debtor's property to the transferee* even though all or substantially all of the primary consideration for the transfer went—not to the debtor—but to another party.

Otherwise it would be far too easy for a defendant in a fraudulent transfer action to raise the specter of "indirect consideration," and place a difficult burden on a trustee to disprove the existence of such indirect consideration or prove that it was not reasonably equivalent. I adopt, therefore, the following rule on reasonably equivalent value: The trustee bears the burden of producing evidence and proving by a preponderance of the evidence that the debtor did not receive direct consideration (in the balance sheet sense) that would constitute reasonably equivalent value. If a transferee then contends that the debtor received indirect consideration for the transfer, then the transferee bears the burden of producing evidence and showing by a preponderance of the evidence that the debtor actually received such indirect consideration and that it constitutes reasonably equivalent value.

Therefore, the Bank, as the transferee of Leasing's security interest, bears the burden of proving that Leasing received some indirect benefit from the Bank's $250,000.00 advance to Contracting, and that the value of that benefit was reasonably equivalent to the value of the interest Leasing transferred. The Bank has failed to carry its burden of proof in both respects.

■ I find that Leasing did not receive reasonably equivalent value in exchange for its grant to the Bank of a security interest in all its assets. The Bank suggests that Leasing expected to obtain indirect economic benefits from its pledge of assets to secure both new and existing loans to Contracting. At the time of the February 23 transfer, Contracting's lease

of equipment accounted for most of Leasing's business, and hence, generated the major portion of Leasing's income. Accordingly, the Bank argues Leasing expected the infusion of additional cash into Contracting's business to generate additional business for Leasing. However, there is no evidence that the advance did in fact result in additional business to Leasing, or, if so, how much additional business. Even though maintaining the flow of business between Contracting and Leasing was of benefit to Leasing, the mere continuation of a pre-existing business relationship at the same or similar levels in no way provided reasonably equivalent value to Leasing in exchange for its grant to the Bank of a security interest in all its assets to secure Contracting's $1,866,265.00 debt to the Bank.[14]

THEREFORE, IT IS ORDERED:

1. Contracting shall pay $6,835.00 to the Bank;

2. Leasing shall pay $27,900.00 to the Bank;

3. Leasing shall endorse the $12,322.50 check held by the Bank;

4. The plaintiff's complaints are otherwise denied;

5. The Bank's security interests in motor vehicles in Arizona, Florida, and Minnesota specified in the order are void under 11 U.S.C. § 544(a)(1);

6. The Bank's security interests in other goods in California and Missouri specified in the order are void under 11 U.S.C. § 544(a)(1);

7. Leasing's transfer to the Bank of a security interest in its property was not a preference, and hence, is not avoidable by Leasing under § 547(b);

8. Contracting's transfer to the Bank of a security interest in its property in Minnesota and Wisconsin was not a preference and hence, is not avoidable by Contracting under § 547(b);

---

**14.** The reality, of course, is that Leasing had no expectations at all. Lundgren and Lebakken, were so desperate for financing for Contracting that they were willing to do whatever the Bank asked.

9. Contracting's transfers to the Bank of security interests in its property in Illinois, Florida, and Arizona were preferences, and hence, are avoidable by Contracting under § 547(b); and

10. Leasing's transfer to the Bank of a security interest in Leasing's assets is void under § 548(a)(2).

LET JUDGMENT BE ENTERED ACCORDINGLY.