In re MINNESOTA UTILITY CON-
TRACTING, INC., and MUC Fleet Leas-
ing & Sales, a partnership, Debtors.

FIRST NATIONAL BANK IN ANOKA
a national banking association,
Plaintiff,

v.

MINNESOTA UTILITY CONTRACTING,
INC., MUC Fleet Leasing & Sales, a
partnership, Defendants.

Bankruptcy Nos. 4–88–1808–RJK,
4–88–1809–RJK.
Adv. Nos. 4–88–177–RJK, 4–88–178–RJK.
Civ. No. 4–89–668.

United States District Court,
D. Minnesota,
Fourth Division.

Feb. 1, 1990.

Lawrence R. Johnson, Steffen & Mun-
stenteiger, Anoka, Minn., Michael Nekich,
Leonard, Street & Deinard, Minneapolis,
Minn., for plaintiff.

Timothy D. Moratzka, Mackall, Crounse
& Moore, Minneapolis, Minn., for defendant
Minnesota Utility Contracting, Inc.

Michael B. LeBaron, Joseph W. Dicker,
Larkin, Hoffman, Daly & Lindgren, Minne-
apolis, Minn., for defendant MUC Fleet
Leasing & Sales.

MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on the
appeal of First National Bank of Anoka
from a June 2, 1989 order and judgment of
the United States Bankruptcy Court. The

judgment will be affirmed in part and reversed in part and remanded.

INTRODUCTION

On January 6, 1984, First National Bank of Anoka (Bank) and Minnesota Utility Contracting, Inc. (Contracting) entered into a revolving credit, term loan, and security agreement in which the Bank agreed to loan Contracting $1,586,000. The loan was secured by a mortgage on real estate in Anoka County, Minnesota, and a security interest in Contracting's accounts receivable, inventory, equipment, furniture and fixtures. Financing statements governing Contracting's accounts receivable, inventory, equipment, furniture and fixtures were filed in Minnesota and Wisconsin on January 11, 1984 and January 19, 1984, respectively.

On August 4, 1986 the Bank and Contracting entered into supplement number 1 to the loan agreement providing for an additional loan of $250,000. In this agreement, Contracting reaffirmed the security interest previously granted to the Bank. Contracting also granted the Bank a security interest in all inventory, accounts, equipment and contract rights. On August 6, 1986 the Bank filed a financing statement in Minnesota governing Contracting's accounts receivable, inventory and general intangibles.

On December 18, 1986 the Bank and Contracting entered into supplement number 2 to the loan agreement, modifying the floor interest rate on the notes. Contracting again reaffirmed its security interest to the Bank.

On January 30, 1987, the Bank and Contracting entered into supplement number 3 to the loan agreement providing for the extension of maturity dates on certain notes. Contracting again reaffirmed its previously granted security interest. As of February 23, 1988, Contracting was indebt-

ed to the Bank in the approximate amount of $1,616,265.

On February 23, 1988 the Bank and Contracting entered into supplement number 4 to the loan agreement providing for an additional loan of $250,000. Contracting again reaffirmed its security interest to the Bank.[1] Until this transaction, all transactions had been strictly between the Bank and Contracting. However, this time the Bank required that MUC Fleet Leasing & Sales (Leasing) secure both the new and existing indebtedness of Contracting by granting a security interest in all Leasing's accounts, contract rights, inventory, equipment, furniture and fixtures. At the time of this transaction, Charles R. Lundgren and Stanley D. Lebakken were the sole shareholders of Contracting and the sole partners of Leasing. At the time of the February 23 transfer, Contracting's lease of equipment accounted for most of Leasing's business, and hence, generated the major portion of Leasing's income. On May 5, 1988, Contracting and Leasing filed chapter 11 petitions, and on May 17, 1989, Contracting voluntarily converted its chapter 11 case to a case under chapter 7. Since filing their chapter 11 petitions, Contracting and Leasing have been in possession of and using equipment, furniture and fixtures subject to the Bank's security interest.

On June 13, 1988, the Bank initiated adversary proceedings against Contracting and Leasing alleging that Contracting and Leasing sold assets subject to the Bank's security interest and deposited the proceeds therefrom without the Bank's consent.[2] In response to the Bank's complaint, Contracting and Leasing filed counterclaims. Contracting claimed that the Bank had failed to properly perfect certain of its alleged security interests and that,

---

1. On March 3, 1988, a financing statement from Leasing was filed with the Secretary of State of Minnesota. On March 17, 1988, financing statements for Contracting and Leasing were filed in Illinois. On March 22, 1988, financing statements for Contracting and Leasing were filed in Florida. On March 23, 1988, financing statements for Contracting and Leasing were filed in Arizona. On April 27, 1988, financing state-

ments for Contracting and Leasing were filed in Wisconsin. No financing statements for Contracting or Leasing were filed in California or Missouri.

2. These claims were resolved in an earlier order and are not now before the Court.

pursuant to section 544 of the Bankruptcy Code, the Bank's unperfected security interests were avoidable by Contracting as debtor in possession. Contracting also asserted that the Bank's filing of financial statements in connection with Contracting's machinery and equipment in Illinois, Florida and Arizona, on March 17, 22 and 23, 1988, respectively, constituted a preferential transfer avoidable by Contracting under section 547(b) of the Bankruptcy Code.

Leasing joined in Contracting's counterclaims and additionally asserted that its grant to the Bank of a security interest on February 23, 1988 to secure the indebtedness of Contracting was an avoidable fraudulent transfer under section 548 of the Bankruptcy Code.[3]

After trial on the plaintiff's complaint and defendant's counterclaims, the bankruptcy court on June 2, 1989, issued a memorandum and order. 101 B.R. 72. The bankruptcy court found that the Bank had failed to perfect its security interest in the property owned by Contracting and Leasing in California and Missouri; that Contracting's transfers to the Bank of security interests in property located in Illinois, Florida and Arizona were avoidable preferential transfers; and that Leasing's transfer to the Bank of a security interest to secure Contracting's indebtedness was an avoidable fraudulent conveyance.[4] The Bank appealed, but prior to oral argument settled its claims against Contracting. The following issues remain as to Leasing:

(1) whether the bankruptcy court erred as a matter of law in placing upon the Bank the burden of proving that Leasing received "reasonably equivalent value" within the meaning of 11 U.S.C. § 548(a)(2) in order to defeat Leasing's claim that its pledge of assets to the Bank on February 23, 1988 was a fraudulent conveyance;

(2) whether the bankruptcy court was clearly erroneous in determining that Leasing did not receive "reasonably equivalent value" for the pledge of assets;

(3) whether the bankruptcy court was clearly erroneous in concluding that Leasing's pledge rendered it insolvent thus making the transfer fraudulent;

(4) whether the bankruptcy court erred as a matter of law in placing upon the Bank the burden of proving that goods subject to the Bank's security interests were "mobile" goods which could be secured by filing in Minnesota pursuant to Minn.Stat. § 336.9–103(3); and

(5) whether the bankruptcy court was clearly erroneous in concluding that the goods at issue were not "mobile" goods.

## DISCUSSION
### Standard of Review

The Court may affirm, modify or revise a bankruptcy court's judgment, order or decree, or remand with instructions for further proceedings. Fed.R.Bky.Proc. 8013. While a bankruptcy court's conclusions of law are reviewed de novo, *Clay v. Traders Bank of Kansas City,* 708 F.2d 1347, 1350 (8th Cir.1983), the Court must affirm the bankruptcy court's findings of fact, whether based on oral or documentary evidence, unless clearly erroneous. Fed.R.Bky.Proc. 8013. Under the clearly erroneous standard, the Court may set aside findings of the bankruptcy court only if firmly convinced that the bankruptcy court erred. *Brookfield Production Credit Association v. Borron,* 36 B.R. 445 (D.Md.), *aff'd,* 738 F.2d 951 (1983).

### I. Fraudulent Transfer of Security Interest

The Bank's first contention is that the bankruptcy court erred in finding that Leasing's pledge of assets was a fraudulent transfer and hence avoidable under section 548 of the Code.

---

**3.** Leasing also counterclaimed that the Bank's retention of $12,322.50 in sale proceeds constituted conversion of Leasing's funds. This claim was resolved in a separate order, and is not now before the Court.

**4.** The bankruptcy court also ordered other relief which is not the subject of this appeal.

■ A "fraudulent transfer" is avoidable under section 548(a)(2) of the Bankruptcy Code if all four of the following conditions are met:

    1. there was a transfer of an interest of the debtor in property;

    2. the transfer was made within one year before the date of the filing of the petition;

    3. the debtor received less than a reasonably equivalent value in exchange for the transfer; and

    4. the debtor was insolvent on the date the transfer was made.

*See In re Ohio Corrugating Co.*, 91 B.R. 430, 436 (Bankr.N.D.Ohio 1988).[5] The burden of proving each of these four elements is on the trustee or debtor in possession. *Id.* at 435; *In re Olson*, 66 B.R. 687 (Bankr.D.Minn.1986). The trustee or debtor in possession must prove each element by a preponderance of the evidence. *Zimmerman v. Saviello*, 78 B.R. 747, 751 (Bankr.E.D.Pa.1987).

The Bank does not dispute that the first two elements of section 548(a)(2) were met. Rather, it disputes the bankruptcy court's conclusions (a) that Leasing received less than a reasonably equivalent value in exchange for the transfer and (b) that Leasing was insolvent on the date the transfer was made.

### A. *Reasonably Equivalent Value*
#### 1. *Burden of Proof*

In regard to equivalent value, the Bank argued that while Leasing did not receive a *direct* benefit from its pledge of assets, in that the $250,000 loan was paid to Contracting, it did receive "an indirect benefit." The bankruptcy court accepted the Bank's argument that an indirect benefit

may, under the proper circumstances, constitute reasonably equivalent value under section 548(a)(2). *See Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir.1981); *In re Ear Nose & Throat Surgeons of Worcester, Inc.*, 49 B.R. 316, 320 (Bankr.D.Mass.1985); *In re Ohio Corrugating Co.*, 91 B.R. at 436. The bankruptcy court held, however, that the argument that Leasing received an indirect benefit was "in the nature of an affirmative defense," and that the burden of proof on this issue should rest with the Bank. Leasing would bear the burden of producing evidence and proving by a preponderance of the evidence that the debtor did not receive "direct" consideration for the transfer, but the Bank would bear the burden of producing evidence and showing by a preponderance of the evidence that Leasing received indirect consideration and that it constituted reasonably equivalent value. Memorandum Order at 33. The bankruptcy court concluded that the Bank failed to carry its burden of proof in both respects.

The Bank claims that by shifting to it the burden of proving an indirect benefit, the bankruptcy court relieved Leasing of the burden of proving all of the necessary elements of a fraudulent transfer, and thereby ignored established precedent placing the burden of proof on the party seeking to avoid a transfer. *See In re Olson*, 66 B.R. 687, 694 (Bankr.D.Minn.1986); *In re Kjeldahl*, 52 B.R. 926, 933 (Bankr.D.Minn. 1985). The bankruptcy court reasoned that unless the burden of proof was shifted to the defendant, it would be far too easy in a fraudulent transfer action for the defendant to "raise the specter of 'indirect consideration' and place a difficult burden on a

---

**5.** Section 548(a) of the Bankruptcy Code reads as follows:

    (a) The trustee may avoid any transfer of an interest of the debtor in property, or in any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

    ....

    (2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

    (B)(i) was insolvent on the date that such transfer was made or such obligation was incurred or became insolvent as a result of such transfer or obligation....

11 U.S.C. § 548(a). The court found that Leasing, as a debtor in possession, has all the rights and powers of a trustee pursuant to 11 U.S.C. § 1107(a). The Bank does not dispute this conclusion.

trustee to disprove the existence of such indirect consideration or prove that it was not reasonably equivalent." Memorandum Order at 33. In support of its conclusion, the bankruptcy court cited the following language from *Garrett v. Falkner (In re Royal Crown Bottlers of North Alabama, Inc.)*, 23 B.R. 28, 31 (Bankr.N.D.Ala.1982):

> Perhaps this particular burden [of establishing the value or lack of value of an indirect benefit] should not be upon the trustee, once it has been established that the direct consideration for the debtor's transfer did not go to it, but to a third party. It is not unreasonable to find that the insolvent debtor's transferee should have the burden of demonstrating that the debtor's estate was not harmed by the transfer of the insolvent debtor's property to the transferee, even though all or substantially all of the primary consideration for the transfer went—not to the debtor—but to another party.

Memorandum Order at 32. The Bank correctly notes that this statement is dicta, in that the bankruptcy court's opinion rested on an entirely different ground. There is substantial support, however, for the proposition that in an action to set aside a conveyance under section 548 where the trustee makes a prima facie case under the act, the burden of going forth with evidence may shift to the creditor. In *In re Butcher*, 51 B.R. 61, 65 (Bankr.E.D.Tenn. 1985), for example, the trustee sought to set aside as fraudulent a pledge in exchange for an $800,000 loan which was paid not to the debtor but to a third party. In allocating the burden of proof on whether the debtor received reasonably equivalent value for the promissory note and mortgage which was granted to the creditor, the court relied on the following excerpt from *Collier on Bankruptcy:*

> In an action by a bankruptcy trustee to set aside a conveyance under section 548, the burden of proof (risk of non-persuasion) that the conveyance was made under the conditions that bring it within section 548 and hence is fraudulent, rests on the trustee. This burden of proof never shifts. "But while the burden of proof does not shift, yet during the progress of the suit the burden of going forward with the evidence to rebut a prima facie case may shift...."

4 *Collier on Bankruptcy* § 548.10 (15th ed. 1985). The court in *Butcher* then held that the Bank met its burden of going forward with evidence by demonstrating that, even though the consideration for the debtor's conveyance of another mortgage went to a third party, the debtor received reasonably equivalent value for the conveyance to the extent that the transaction ultimately discharged his own debt to that third party. The Bank having met its burden of producing evidence, the court concluded that the plaintiff "failed to carry the burden of proof." 51 B.R. at 65.

Here, the bankruptcy court's order appears to allocate the burdens in the same manner. The court does state in one part of its part of its opinion that the Bank's argument that Leasing received an indirect benefit was "in the nature of an affirmative defense" and that therefore "the burden of proof is on the Bank to establish that Leasing received reasonably equivalent value." Memorandum Opinion at 32. That a claim to indirect benefit is in the nature of an affirmative defense finds some support in cases interpreting section 548(c) of the Bankruptcy Code, which provides that even when a trustee has discharged its burden of proof that a transfer was fraudulent under section 548, the transfer nevertheless is not voidable as to a good faith transferee for value. Courts interpreting this provision have placed the burden of proof upon the party claiming to be a good faith transferee. 4 *Collier on Bankruptcy* § 548.10 (15th ed. 1985); *Chorost v. Grand Rapids Factory Showrooms, Inc.*, 77 F.Supp. 276, 280 (D.N.J. 1948), *aff'd*, 172 F.2d 327 (3d Cir.1949) ("the fraudulent intent of the transferor having been established by competent evidence, the transferee must prove not only that he paid a valuable consideration but also that he acted in good faith without knowledge of the fraud"); *Bentley v. Young*, 210 F. 202, 205 (S.D.N.Y.1914), *aff'd*, 223 F. 536 (2d Cir.1915) ("the defense of a bona fide purchase[r] for value has

always been an affirmative defense in the law ...").

It was not necessary, however, for the court to go so far as to place the entire burden of proof upon the Bank in this instance, and a review of the evidence indicates that it did not truly do so. Courts have generally placed the burden of proving all of the elements of a fraudulent transfer upon the debtor seeking to avoid the transfer. *See, e.g., In re Olson,* 66 B.R. at 694; *In re Kjeldahl,* 52 B.R. at 933; *Collier, supra.* There is a difference, however, between shifting the burden of proof, and shifting the burden of producing evidence to meet a prima facie case. 9 *Wigmore,* Evidence § 2487 (3d ed.). As *Wigmore* writes:

> The burden of the issue and the duty of going forward with evidence are two very different things. The former remains on the party affirming a fact in support of his case, and does not change at any time throughout the trial. The latter may shift from side to side as the case progresses, according to the nature and strength of the proofs offered in support or denial of the main fact to be established.... A "prima facie case," or "prima facie evidence," does not change the burden of proof. It only stands until its weight is met by evidence to the contrary.... According to the best considered authorities, a "prima facie" case so made out need not be overcome by a preponderance of the evidence or by evidence of greater weight; but the evidence needs only to be balanced, put in equipoise, by some evidence worthy of credence; and if this be done, the burden of the evidence has been met and the duty of producing further evidence shifts back to the party having the burden of proof....

*Id., quoting Speas v. Merchants Bank & Trust Co.,* 188 N.C. 524, 125 S.E. 398, 401 (1924).

While the bankruptcy court did state that it was placing the "burden of proof regarding equivalent value" on the Bank, it later explained this statement when it said that it was placing upon the trustee the burden of producing evidence that it did not receive "direct" consideration, and then shifting to the Bank the burden to prove that Leasing received *indirect* consideration. Thus, it is clear that the bankruptcy court never truly shifted the ultimate burden of proof on the issue to the Bank. Rather, it required the debtor to produce evidence that it received no direct benefit for the pledge of assets. Leasing having done so by showing that the loan proceeds went to a third party, the bankruptcy court then required the Bank to meet this evidence with some proof that Leasing received indirect benefit from the loan. To do so was not to shift the *ultimate* burden of proof of reasonably equivalent value upon the Bank, but rather to shift an intermediate burden of meeting the debtor's prima facie case. Had the evidence regarding value on both sides been equal, the Bank would have been entitled to judgment in its favor on the issue. The Court finds no error in the manner in which the bankruptcy court allocated the burdens of production and proof.

### 2. Whether Leasing Received Reasonably Equivalent Value for its Assets

Under 11 U.S.C. § 548(a)(2), if Leasing received "reasonably equivalent value" for its pledge of assets to the Bank, it did not make an avoidable fraudulent transfer. Whether a transfer is made for reasonably equivalent value is a question of fact to be determined in light of the facts presented in each particular case. *Jacoway v. Anderson (In re Ozark Restaurant Equipment Co., Inc.,* 850 F.2d 342, 344 (8th Cir.1988)). Transfers made or obligations incurred solely for the benefit of third parties do not furnish a reasonably equivalent value. *In re Ear Nose & Throat Surgeons of Worcester, Inc.,* 49 B.R. 316 (Bankr.D.Mass.1985). In a case under the former bankruptcy act, the court in *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979 (2d Cir.1981), articulated the reason for this presumption as follows:

> If the debt secured by the transaction is not the debtor's own, then his giving of security will deplete his estate without

bringing in a corresponding value from which his creditors can benefit, and his creditors will suffer just as they would if the debtor had simply made a gift of his property or obligation.

*Id.* at 991.

■ In arguing that Leasing did receive reasonably equivalent value for its pledge of assets, the Bank contends that since, at the time of the transfer Contracting accounted for most of Leasing's business, the infusion of additional cash into Contracting necessarily generated additional business for Leasing, and this additional business constituted reasonably equivalent value for the pledge. Furthermore, the Bank argued that Leasing received "dollar for dollar" benefit from the $250,000 loan to Contracting, since both Leasing's sole general partners, Lundgren and Lebakken, held 100 percent of the stock of Contracting. The Bank argues that to the extent that its loan to Contracting preserved that company, the same loan necessarily preserved the net worth of Leasing by maintaining or enhancing the value of Leasing's general partners' interest in Contracting, which interest would be subject to the claims of Leasing's creditors. *See In re Lawrence Paperboard Corp.,* 76 B.R. 866, 876 (Bankr.D.Mass.1987); *Johnson v. First National Bank,* 81 B.R. 87, 89 (Bankr.N.D. Fla.1987). The Bank also relies upon 11 U.S.C. § 101(31)(B) which defines insolvency for partnerships under the Bankruptcy Code as including the net worth of each general partner. Thus, the Bank argues that Leasing received $250,000 in benefit in exchange for a pledge of assets worth no more than $222,616.

Having placed the burden of producing evidence on the Bank, the bankruptcy court held that the Bank had not produced sufficient evidence that the $250,000 loan to Contracting did "in fact" result in additional business to Leasing, or, if so, how much additional business. According to the bankruptcy court, the mere continuation of a preexisting business relationship at the same or similar level did not provide reasonably equivalent value to Leasing.

In determining whether a debtor has received fair consideration for the transfer, the Court should consider the purpose of the requirement, which is to conserve the debtor's estate for the benefit of creditors. *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979, 992 (2d Cir.1981). Any significant disparity between the value received and the obligation assumed will have significantly harmed the innocent creditors of the debtor. *Id.* at 994. In *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979, 991 (2d Cir.1981), a case decided under the repealed bankruptcy act which provided for avoidance of conveyances made without "fair consideration," the court acknowledged that consideration to a third party which confers "economic benefit" on the debtor may establish fair consideration. A review of the cases finding indirect benefit, however, indicates that the benefit must be fairly concrete. *See Mayo v. Pioneer Bank & Trust Co.,* 270 F.2d 823 (5th Cir.1959), *cert. denied,* 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 877 (1960) (corporate debtor's repayment of loan to stockholder was fair consideration where stockholder contributed loan proceeds to corporation's capital); *Barr & Creelman Mill & Plumbing Supply Co. v. Zoller,* 109 F.2d 924, 926 (2d Cir.1940) (debtor's discharge of a third person's debt fair exchange for discharge of debtor's own debt); *Klein v. Tabatchnick,* 610 F.2d 1043, 1047 (2d Cir. 1979) (corporation's grant of security interest in corporate property was fair consideration for secured party's pledge of personal property as collateral for bank loan to stockholder, who in turn loaned proceeds to corporation).

Here, the Bank claims that the benefit received was not discharge of some preexisting liability of Leasing, or some other readily quantified benefit, but rather the promise of continued business between Contracting and Leasing. After hearing the evidence, the bankruptcy court concluded that the Bank had produced "no evidence that the advance did in fact result in additional business to Leasing, or, if so, how much additional business." Memorandum Order at 34. The Court holds that this finding was not clearly erroneous.

The Bank, however, also argues that the benefit to Leasing of the loan to Contracting must be viewed in terms of the effect the loan had on Leasing's net worth. The Bank contends that since Leasing's general partners owned 100 percent of the stock in Contracting, the Bank's loan to Contracting benefited Leasing on a "dollar for dollar basis." The Bank, however, simply argues that this is a necessary result, and offers no proof as to the specific impact of the loan on the Contracting stock owned by Leasing's general partners. The Bank cites no evidence in the record on this point. After reviewing the record the Court finds that the bankruptcy court was not clearly erroneous in concluding that the Bank had failed to produce sufficient evidence of the benefit to Leasing of the $250,000 loan to Contracting. Leasing having demonstrated that it did not receive any direct benefit from the loan, and in the absence of any evidence from the Bank of indirect benefit, the bankruptcy court properly concluded that Leasing's pledge of assets was a fraudulent transfer.

**B.** *Did Leasing's Pledge of Assets Render it Insolvent?*

Under 11 U.S.C. § 101(31), the insolvency of a partnership is defined as:

(B) ... financial condition such that the sum of such partnership's debts is greater than the aggregate of, at a fair valuation—

(i) all of such partnership's property, exclusive of the property [concealed with the intent to defraud or hinder creditors]; and

(ii) the sum of the excess of the value of each general partner's nonpartnership property, exclusive of property [con-

cealed with the intent to defraud or hinder creditors], over such partner's non-partnership debts....

The bankruptcy court determined that prior to the pledge of assets on February 23, 1988, Leasing had partnership assets worth $222,616 plus a nonpartnership net worth of $276,909, with total Leasing assets of $499,525. The bankruptcy court also determined from Leasing's balance sheet dated February 29, 1988 that it had partnership liabilities of $387,719. The Bank argues that given these figures, Leasing was not insolvent prior to the February 23 grant of a security interest, but rather had a net worth of $111,806. The bankruptcy court, however, held that Leasing's pledge of assets created a partnership debt "at least equal to the amount of Contracting's debt to the Bank on February 23," and that therefore an additional $1,866,265 must be added to Leasing's other liabilities. Memorandum Order at 29. With this additional liability, Leasing, according to the bankruptcy court, was rendered insolvent by the transfer.

■ The Bank objects that Leasing did not assume Contracting's liability but only liability for the value of the assets which it pledged. The Bank notes that Leasing did not execute any promissory note to the Bank regarding Contracting's debt. Thus, it argues that its liability to the Bank was limited to the value of the equity in the assets which it pledged. The Bank concludes that Leasing was rendered insolvent as a result of the pledge only if Leasing's equity in those assets exceeded its net worth of $111,000 on February 23, 1988.[6]

While the Bank argues that Leasing presented no evidence to the bankruptcy

---

**6.** The Bank is correct that Leasing could not have been sued for more than the value of its assets, no matter what Contracting's debt to the Bank was. Indeed, Leasing does not argue that when it pledged its assets as security for the loan to Contracting, it assumed any liability beyond the liability of those assets. At page 7 of its memorandum Leasing states that "while Leasing could not have been sued by the Bank for any deficiency beyond the value of the collateral pledged, its assets were certainly subject to an encumbrance in favor of the Bank...."

As Leasing argues, the security agreement pledged all of Leasing's assets "whether now or hereafter acquired" to secure all of Contracting's debt "now existing or hereafter at any time created ... *without limit as to amount.*" Trial Exh. 13 (emphasis added). While the Bank's recourse was not to Leasing itself but only to its assets, Leasing's theoretical liability was in fact as high as Contracting's debt to the Bank. Thus the bankruptcy court was probably correct in including the full amount of Contracting's debt in determining Leasing's insolvency following the pledge.

court on this point, it appears that the Bank never disputed that Leasing's partnership assets were worth $222,616 as listed on its financial statement dated February 29, 1989, and admitted into evidence at trial. Trans. at 116, x52. If, as the Bank itself argues, Leasing's net worth on February 23 was only $111,000, then clearly it was rendered insolvent by its pledge of its assets to the Bank worth $222,616. Thus, Leasing was rendered insolvent by the pledge, even if the full amount of Contracting's debt to the Bank is not counted. The Court finds no clear error in the court's finding that Leasing's pledge of assets to the Bank rendered it insolvent.

## II. Did the Bank Perfect its Security Interest in Goods Located in Missouri and California?

On March 3, 1988, the Bank filed financing statements in Minnesota perfecting its security interest in various goods owned by Leasing. The bankruptcy court held these financing statements ineffective to perfect the Bank's security interest in goods located in Missouri and California. The Bank argued that the filing in Minnesota was effective as to these goods because the equipment constituted "mobile" goods under Minn.Stat. § 336.9–103(3), and corresponding statutes in Missouri and California, which provide that a security interest in mobile goods is perfected by filing a financing statement in the state where the debtor has its principal place of business. The bankruptcy court rejected this analysis, holding that the Bank failed to carry its burden of proving that the goods were "mobile" within the statutory definition. According to the bankruptcy court, since the Bank did not file financing statements in the states where the equipment was located, its security interests in these pieces of equipment were not perfected and hence could be avoided.

### A. Burden of Proof

Perfection is determined by state law. *In re Hilyard Drilling Co., Inc.*, 840 F.2d

596 (8th Cir.1988); *In re Walters*, 61 B.R. 426, 429 (Bankr.D.Mont.1986), *citing Palmer v. Radio Corporation of America*, 453 F.2d 1133, 1138 (5th Cir.1971). California, Minnesota and Missouri have all adopted UCC 9–103(3).[7] Under this section, goods are perfected according to the law of the state in which the debtor is located if they are mobile and:

> of a type normally used in more than one jurisdiction, such as motor vehicles, trailers, rolling stock, airplanes, shipping containers, road building and construction machinery and commercial harvesting machinery and the like, if the goods are equipment or are inventory leased or held for lease by the debtor to others, and are not covered by a certificate of title....

*Id.*

The Bank first claims that the bankruptcy court erred in placing upon the Bank the burden of proving that Leasing's equipment located in Missouri and California were "mobile" goods. The Bank cites the "general rule that a [debtor in possession] in bankruptcy seeking to avoid a purported security interest bears the burden of proving the imperfection or invalidity of that interest." *In re Davison*, 738 F.2d 931, 936 (8th Cir.1984). According to the bankruptcy court, however, the Bank must bear the burden of proof on the issue of whether the goods which it sought to perfect were "mobile," since the party arguing the applicability of a law bears the ultimate burden of proving the existence of the facts which must exist before such law is applied. *In re American Provision Co.*, 44 B.R. 907, 909 (Bankr.D.Minn.1984).

The bankruptcy court noted that the statute called for a determination as to whether the property sought to be secured is of a type normally used in more than one jurisdiction by all persons, not just the particular debtor. Thus, according to the bankruptcy court, the issue is not Leasing's *unique* use of the goods, but rather the

---

**7.** *See* California Commercial Code § 9103(3) (West); Minn.Stat. § 336.9–103(3); Mo.Rev.Stat. § 400.9–103(3).

nature of the goods themselves, and the uses to which such goods are *generally* put. The bankruptcy court noted that since the issue was the nature of the goods, and not the use to which the debtor put the goods, the debtor does not have unique knowledge of the facts at issue, and need not for that reason bear the burden of proof.

■ The Court finds that the bankruptcy court was correct in requiring the Bank to produce evidence of the applicability of section 9–103(3). However, just as on the issue of the burden of proving reasonably equivalent value, it is apparent that the bankruptcy court did not shift the ultimate burden of proving valid perfection, but rather shifted to the Bank an intermediate burden of rebutting the debtor's prima facie case that the security interests were not validly perfected. The debtor showed that financing statements were not filed for these goods in the states where the goods were located. This established a prima facie case that the security interests were not perfected. The Bank attempted to rebut that case by arguing that the goods were "mobile" and could be secured by filing in the jurisdiction of the debtor's residence, *i.e.,* Minnesota. The Bank failed to produce sufficient evidence in support of this claim and the bankruptcy court granted judgment on this issue to the debtor. It is clear that on the facts of this case the bankruptcy court did not shift the ultimate burden of proof, but only an intermediate burden to produce evidence. Thus, the Bank's claim that the bankruptcy court erred as a matter of law by shifting to the Bank the burden of proof must fail.

### B. *Were the Goods "Mobile"?*

The filing exception for mobile goods under the UCC looks to whether goods are of a type "normally used" in more than one jurisdiction; there is no requirement that particular goods be *in fact* used out of state. Minn.Stat. § 336.9–103, Official Comment 5(b). In *Ingersoll–Rand Financial Corp. v. Nunley,* 11 B.R. 528, 532–33 (Bankr.W.D.Va.1981), the court discussed the meaning of the term "mobile." Ac-

cording to the court, mobility is not measured simply by the ease with which an item is moved from state to state, noting that a typewriter might be carried from one state to another but is normally used in only one jurisdiction, while such goods as automobiles, trailers and airplanes, due to their very nature, are normally used in more than one state. *Id.* at 532. A tractor-truck used in hauling in interstate commerce has been held to be a mobile good, *In re Dobbins,* 371 F.Supp. 141 (D.Kan. 1973), as have large earth-moving trucks, *General Electric Credit Corp. v. R.A. Heintz Construction Co.,* 302 F.Supp. 958 (D.Ore.1969). The court in *Ingersoll–Rand* concluded that a piece of mining equipment, a hydraulic coal trailer, did not fit the statutory definition because it was the type of equipment which would "normally" be taken to a particular mine to be used there for a great length of time, perhaps never to be moved. The court based this conclusion on testimony from a number of witnesses. *Id.* at 532.

The bankruptcy court found that the evidence introduced at trial was insufficient to enable it to determine whether the goods owned by the debtor in California and Missouri were "of a type normally used in more than one jurisdiction." The Bank argues that it did not need to put in evidence on this point because the goods subject to the financing statements filed in Minnesota were "construction machinery" which is specifically mentioned in the statute as an example of goods which are mobile and which are of a type normally used in more than one jurisdiction.

Leasing correctly notes, however, that the list of equipment in Exhibits 36 and 37 reveals a wide variety of items, and does not provide a basis for determining which, if any, are "mobile" goods within the statutory definition. The bankruptcy court was correct in refusing to make a blanket finding that all of the equipment in issue here was "mobile" and "of a type normally used in more than one jurisdiction." The Bank was required to produce evidence as to which, if any, of the goods covered by its claimed security interest met the definition, and it failed to do so. While the Court

concludes that the bankruptcy court's finding on this issue was correct based on the evidence before it, the issue will be remanded to the bankruptcy court to permit the Bank to introduce evidence specifically directed at this point. The Court reaches this result because the Court finds that the Bank may have reasonably but erroneously relied on the broad language in *In re Davison*, and believed that it could "stand pat" on this issue, requiring Leasing to prove what goods did *not* meet the statutory definition. The Court finds no cases directly placing the burden to produce evidence on this issue upon the creditor, and holds that the Bank's position, although incorrect, was not unreasonable. The Bank should have the opportunity to prove what goods meet the definition, and the Court will remand to permit the Bank to introduce evidence on this point alone.

Therefore, based on the foregoing, and upon all the files, records and proceedings herein,

IT IS ORDERED that

1. the June 2, 1989 order and judgment of the bankruptcy court is affirmed in part and reversed in part;

2. the matter is remanded to the bankruptcy court for further proceedings consistent with Part II of this opinion.