In re ORGANIC CONVERSION
CORPORATION, Debtor.

Michael J. Iannacone, Trustee,
Plaintiff,

v.

New Holland Credit Company,
Defendant.

Bankruptcy No. 98–34115.
Adversary No. 99–3292.

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Feb. 26, 2001.

# FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

GREGORY F. KISHEL, Chief Judge.

This adversary proceeding came on before the Court on November 17, 2000, for trial. The Plaintiff appeared. The Defendant appeared by its attorney, Stephen J. Creasey. Upon the evidence adduced at trial and the arguments and memoranda from counsel, the Court makes the following:

## FINDINGS OF FACT

1. The Debtor is a Minnesota corporation. Its primary place of business and its executive offices are located in Empire, Minnesota. It produces packaged potting dirt, peat moss, screened compost, chipped bark, and other soil enhancements for home and garden use.

2. The Debtor filed a voluntary petition for reorganization under Chapter 11 on July 9, 1998. On October 3, 1998, the Plaintiff was appointed as Trustee pursuant to 11 U.S.C. § 1104(a). On August 6, 1999, the Court confirmed a plan of reorganization proposed by the Committee of Junior Mortgage Noteholders in the case. Under Article V of the plan, the Plaintiff was to retain the status of "Creditor Representative" and was empowered and required to conduct all subsequent litigation for avoidance of preferential and fraudulent transfers.

3. The Debtor historically conducted its operations in Minnesota, mining peat at a bog in Rice County, composting at Rosemount, and bagging at Empire. In 1997–98, it acquired and prepared a production facility at Pacific Junction, Iowa, intending to service the Omaha–Council Bluffs retail market from there.

4. The Debtor is classified as a Certificated Resource Recovery Facility under Minnesota law. As a result, its purchases of equipment for processing solid or hazardous waste are exempt from certain provisions of the Minnesota sales and use tax laws, MINN. STAT. § 297A.25 subd. 28.

5. On January 26, 1998, the Debtor purchased a piece of personal property called a Multitek Multi-screen Model 650 DMC [1] with an 80–horsepower John Deere engine from Carlson Tractor and Equipment Company of Rosemount, Minnesota ("Carlson").[2] The purchase price was $76,000.00, of which $62,020.00 was financed by Carlson under a retail installment sale contract. The debt was secured by the Debtor's grant of a purchase money security interest. Carlson then assigned its rights as creditor and secured party to the Defendant.

6. On February 2, 1998, the Debtor submitted an exemption certificate to the Minnesota Department of Revenue, claiming an exemption from state sales and use tax for its purchase of the screener based upon prospective use at its Certified Resource Recovery Facility. Acting in reliance on this submission, Carlson did not charge the Debtor sales tax on the purchase.

7. On February 18, 1998, the Defendant filed a financing statement on a UCC–1 form with the office of the Secretary of State of Minnesota, asserting the status of secured party as to the screener. The Defendant did not file a financing statement or any other written assertion of its security interest in any other public office, in Minnesota or elsewhere.

8. The screener is an assembly of a screening apparatus with flail hammers and brushes and a discharge conveyor belt for offloading. It is about 35 feet long in all, without the discharge belt extended. It is mounted on two rear axles. It has a "fifth wheel kingpin hookup" for connec-

---

**1.** These initials stand for "Diesel Motor Conveyor."

**2.** For brevity, the full item—the focus of the Plaintiff's complaint—will be called "the screener."

tion to a semi-tractor, a sort of platform with one wheel mounted underneath and a tongue at its front. It bears a serial number, 5020896.

9. The screener is not self-propelled, though it is equipped with airbrakes and lights to be controlled by the operator of the hauling vehicle. It does not have space to carry people or property. As constructed, it would have no use *per se* while in transit on a highway; it would be present there only when being transported between sites of usage or to a place of repair.

10. The screener is designed for use in a number of settings, principally construction sites, sand and gravel pits, black dirt and compost production facilities, and nurseries and landscaping businesses. It is used to pulverize soil, compost, manure, sand, gravel, and other product, and to separate out undesirable waste like rocks, twigs, and garbage.

11. The Debtor's managers, the Jensen brothers, purchased the screener for use at any or all of the Debtor's locations at Empire, Rosemount, Rice County, or Pacific Junction. The mobility of the unit within and between locations was a factor in their decision. The screener was physically suited for operation at any of the Debtor's sites.

12. Around the time that the Debtor and Carlson closed the sale of the screener, Carlson delivered it to the Debtor's site at Empire.[3] At Empire, the Debtor experienced problems with belts on the unit on two different occasions. Both times, Carlson took it back to its shop for repair.

13. By the first week of February, 1998, the Jensens decided that the screener lacked enough capacity to be useful at Empire or the Debtor's other Minnesota sites, but that it could be used in the bagging operations at Pacific Junction. The Debtor then hired Carlson to transport the screener to Iowa. Carlson com-

pleted the haul and issued an invoice to the Debtor on February 5, 1998.

14. At Pacific Junction, the Debtor had further problems with the screener's operation. In October, 1998, the Debtor returned it to Multitek's factory at Prentice, Wisconsin for repairs and modifications.

15. After its return from Wisconsin, the screener remained at Pacific Junction until the Debtor's filing under Chapter 11. The screener is presently there. It is in normal operating condition.

16. Carlson has sold only three units of this model of Multitek screener, including the one to the Debtor. Of the other two, one has remained on the site of its owner's operations in Red Wing, Minnesota, and the other has been regularly transported between its owner's Austin, Minnesota place of business and locations in Iowa as needed.

17. When Carlson took delivery of the screener into its inventory in November, 1996, Multitek sent Carlson a "Manufacturer's Certificate of Origin" for it. On the certificate, Multitek gave the "body type" of the unit as "Trailer."

18. Though Carlson sells at least two other lines of multi-screener units, Multitek is the only manufacturer that forwards a Manufacturer's Certificate of Origin to Carlson.

19. For at least ten years, Carlson has not obtained a certificate of title for a multi-screener unit from the Minnesota Department of Public Safety.

20. Within 90 days before its bankruptcy filing, the Debtor paid the Defendant a total of $1,400.00 on account of the screener. After the filing, and through January 15, 1999, the Debtor paid the Defendant a total of $12,385.31. The Defendant has not received a payment on the Debtor's account from anyone since February 15, 1999.

---

**3.** The record suggests that the Debtor took pre-sale possession for a tryout, but it is not entirely clear on the point. Ultimately, this is not material.

## CONCLUSIONS OF LAW

1. Under MINN. STAT. §§ 336.9–103(1)(b) and 336.9–401(1)(d), the Defendant's initial filing with the Minnesota Secretary of State properly perfected its security interest in the screener at that time.

2. The screener was a "mobile good" within the scope of MINN. STAT. § 336.9–103(3).

3. As a result, the Defendant's security interest remained perfected after the Debtor removed the screener to Pacific Junction, Iowa.

4. The Defendant's security interest having been fully perfected when the Debtor filed its petition under Chapter 11, it is not subject to avoidance under 11 U.S.C. § 547(b).

5. As a result, the Debtor's pre-petition payments to the Defendant are not subject to avoidance under 11 U.S.C. § 547(b), and its post-petition payments to the Defendant are not subject to avoidance under § 549(a).

## DISCUSSION

In his complaint, the Plaintiff seeks a judgment avoiding the Defendant's security interest against the screener pursuant to 11 U.S.C. § 547(b)[4], and recovering all payments identified in Finding of Fact 20, pursuant to 11 U.S.C. §§ 547(b) and § 549(a)[5]. As he would have it, when the Debtor filed for relief under Chapter 11 the security interest was not properly perfected under Article 9 of the Uniform Commercial Code, as enacted at MINN. STAT. § 336.9–101 *et seq.*, and the Defendant thus held an unperfected security interest. As the Plaintiff points out, a pre-petition transfer of a debtor's interest in property that is not perfected by the date of the debtor's bankruptcy filing is deemed to have taken place immediately before then. 11 U.S.C. § 547(e)(2)(C).[6]

4. Subject to exceptions that are not applicable here, this statute provides, in pertinent part:

> (b) ... the trustee may avoid any transfer of an interest of the debtor in property—
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made—
> (A) on or within 90 days before the date of the [bankruptcy] petition ...
> ...
> (5) that enables such creditor to receive more than such creditor would receive if—
> (A) the case were a case under chapter 7 of [the Bankruptcy Code];
> (B) the transfer had not been made; and
> (C) such creditor received payment of such debt to the extent provided by the provisions of [the Bankruptcy Code].

The grant of a security interest in personalty is a transfer within the meaning of this statute.

5. Subject to exceptions that are not applicable here, this statute provides, in pertinent part:

> ... the trustee may avoid a transfer of property of the estate—
> (1) that occurs after the commencement of the case; and
> (2) ...

> (B) that is not authorized under [the Bankruptcy Code] or by the court.

The Plaintiff invokes this avoidance power against the post-petition payments. He does so on a three-stage argument: avoiding the Defendant's lien would mean that its claim would be deemed to have been unsecured as of the Debtor's bankruptcy filing; no provision of the Bankruptcy Code authorizes a reorganizing debtor to make a post-petition, pre-confirmation payment on account of an unsecured claim, at least absent explicit authorization by the court; and, here, the Court never gave such authorization.

6. With an exception not applicable here, this statute provides:

> For the purposes of this section, ... a transfer is made—
> ...
> (C) immediately before the date of the filing of the [bankruptcy] petition, if such transfer is not perfected at the later of—
> (i) the commencement of the case; or
> (ii) 10 days after such transfer takes effect between the transferor and the transferee.

Neither party argues that § 547(e)(2)(C)(ii) applies here. As between the Debtor and the Defendant, the transfer was clearly effective upon the Debtor's grant of the security interest in January, 1998.

.

Thus, the Plaintiff argues, the transfer of the security interest that is deemed to have taken place on July 9, 1998, was within 90 days before the Debtor's bankruptcy filing, § 547(b)(4)(A); was made on account of an antecedent debt (that created under the January 26, 1998 retail installment sale contract), § 547(b)(2); was made while the Debtor is presumed to have been insolvent, §§ 547(b)(3) and 547(f); and preferred the Defendant over other creditors holding unsecured claims, § 547(b)(5), because it attached to fully secure the Debtor's debt to the Defendant.[7] Then, as the Plaintiff argues: 1. the security interest must be avoided; 2. all payments that the Debtor made within the 90 days pre-petition must be avoided, as they were made on account of newly-unsecured indebtedness and hence preferred the Defendant; and, 3. the Debtor's post-petition payments must be avoided, because they were not authorized by a court order and the Bankruptcy Code itself does not authorize a reorganizing debtor to make post-petition payments on account of pre-petition debt.

On the other hand, the Defendant maintains that its security interest was properly perfected when it filed with the Minnesota Secretary of State on February 18, 1998. If the Defendant is correct, there was no transfer within the 90–day period of § 547(b)(4), and the Plaintiff's whole case for avoidance fails on a single element, the proximity requirement.

 The sole issue presented at trial was whether the February, 1998 filing properly perfected the Defendant's security interest.[8] Under the facts presented, the result will turn on the proper situs for perfection.[9] That, in turn, will depend on the legal classification of the screener under Article 9. *Konkel v. Golden Plains Credit Union,* 778 P.2d 660, 662 (Colo. 1989). As the proponent of the notion that the Defendant's security interest is unperfected, the Plaintiff has the burden of proof. *In re Davison,* 738 F.2d 931, 936 (8th Cir.1984). This amounts to an initial burden of production of evidence. *In re Minnesota Utility Contracting, Inc.,* 110 B.R. 414, 423 (D.Minn.1990).

As the Plaintiff's theory evolved through complaint, trial brief, response, and oral presentation; it split into two alternative arguments. The first was that the screener was "equipment" within the meaning of MINN. STAT. § 336.9–109(2), and as a result it was an "ordinary good"; therefore, the Defendant had been required under MINN. STAT. § 336.9–103(1)(b) to perfect under the laws of Iowa after the Debtor moved the screener there. The second is that, given its mobility, the screener was a "vehicle" subject to MINN. STAT. ch. 168A; therefore, the Plaintiff argues, the only way for the Defendant to perfect its security interest was by a memorialization on a certificate of title that neither Carlson nor the Debtor ever obtained.

The Defendant's responses show that there is something to the seamless web after all; they rebut the Plaintiff's arguments with a single, intertwined, and ultimately accurate characterization for the screener.

 The discussion should cover the broader concept first. The screener clearly is "equipment," within the expansive definition of MINN. STAT. § 336.9–109(2)[10]: it is a "good," the Debtor both

7. Under the plan confirmed in the Debtor's case, unsecured creditors are to receive only a pro rata payment from certain assets on account of their claims. Under the facial terms of the plan, this was not to amount to a payment in full.

8. The Defendant essentially conceded all of the other elements of § 547(b), were the Plaintiff to prevail on the proximity requirement.

9. There is no dispute over the adequacy of description, or over any other technical aspect of the financing statement's content.

10. The relevant language is:
Goods are

bought it for use in its business and actually used it there, and it does not fall within the Uniform Commercial Code's definitions of inventory, farm products, or consumer goods.[11] Were the screener placed into that general category, the Defendant's original filing in Minnesota was sufficient to perfect at that time, under MINN. STAT. §§ 336.9–302(1) and 336.9–401(1)(d); that was the jurisdiction where the screener was located, as contemplated by MINN. STAT. § 336.9–103(1)(b).[12] With the screener's long-term transfer to Iowa, however, Article 9's general rule for multiple-state transactions applies. This, too, is contained in MINN. STAT. § 336.9–103(1)(b). The operative clause of the statute is convoluted, but it has been aptly read as

mandat[ing] that the law of the jurisdiction in which the collateral was located when the last perfecting event occurred determines whether a security interest is perfected. In other words, the last event test determines in which state a creditor must file to perfect its security interest in multi-state transactions.

. . .

(2) "equipment" if they are used or bought for use primarily in business (including farming or a profession) or by a debtor who is a nonprofit organization or a governmental subdivision or agency or if the goods are not included in the definitions of inventory, farm products or consumer goods . . .

**11.** MINN. STAT. § 336.9–109 provides:

Goods are

(1) "consumer goods" if they are used or bought for use primarily for personal, family or household purposes;

. . .

(3) "farm products" if they are crops or livestock or supplies used or produced in farming operations or if they are products of crops or livestock in their unmanufactured states (such as ginned cotton, wool-clip, maple syrup, milk and eggs), and if they are in the possession of a debtor engaged in raising, fattening, grazing or other farming operations. If good are farm products they are neither equipment nor inventory;

*In re Morken,* 199 B.R. 940, 961 (Bankr. D.Minn.1996). The nature of a "last event on which is based the assertion that the security interest is perfected or unperfected" is none too clear from those words, as such.

[I]t is clear, however, that in situations where the security interest is perfected in one jurisdiction and the collateral is removed to another, the failure to maintain perfection in the latter jurisdiction is the "last event" to which the rule refers.

*Id.* [citations omitted]. As a general rule, to perfect a security interest in a good within its jurisdiction, Iowa requires filing of a financing statement, IA. CODE § 554.9302, subd. 1, in the office of its secretary of state, IA. CODE § 554.9401, subd. 1, para. c. The Defendant did not do this after the Debtor removed the screener to Iowa. The application of the general rule, then, would mean that the Defendant's security interest was unperfected when the Debtor filed for Chapter 11.

There is, however, a key exception, for "mobile goods," as defined by MINN. STAT. § 336.9–103(3)(a).[13] The Defendant

(4) "inventory" if they are held by a person who holds them for sale or lease or to be furnished under contracts of service or if he has so furnished them, or if they are raw materials, work in process or materials used or consumed in a business. Inventory of a person is not to be classified as his equipment.

**12.** The relevant text of this statute is:

. . . perfection and the effect of perfection or nonperfection of a security interest in collateral are governed by the law of the jurisdiction where the collateral is when the last event occurs on which is based the assertion that the security interest is perfected or unperfected.

**13.** In pertinent part, the definition is:

. . . goods which are mobile and which are of a type normally used in more than one jurisdiction, such as motor vehicles, trailers, rolling stock, airplanes, shipping containers, road building and construction machinery and commercial harvesting machinery and the like, if the goods are equipment . . ., and are not covered by a certificate of title described in [MINN. STAT. § 336.9–103](2).

urges this as its haven from the snares of the general rule.

 Interestingly, the analysis on this argument requires one to pass through the Plaintiff's alternative theory, on the threshold element of MINN. STAT. § 336.9–103(3). For personalty to be a mobile good, it must not be covered by a certificate of title as such document is contemplated by MINN. STAT. § 336.9–103(2). The latter statute incorporates MINN. STAT. ch. 168A by reference. MINN. STAT. § 336.9–103(2)(a). Perforce, a "vehicle" for which ownership must be evidenced by a certificate of title issued by the Minnesota Department of Public Safety cannot be a "mobile good."

 Late in the pre-trial development of his case, the Plaintiff hedged his bets by raising the argument that the screener was a "vehicle" subject to MINN. STAT. ch. 168A. The theory, however, is quite misplaced. By its very design and manufacture, the screener can neither carry nor pull persons or property on a public thoroughfare. This is required for qualification as a "vehicle" under MINN. STAT. § 168A.01 subd. 24.[14] Not being a "vehicle" in the first instance, the screener is not subject to the issuance of a certificate of title. In any event, a further qualifica-tion under the Motor Vehicle Registration Act pushes the screener further out of its scope; it also qualifies as "special mobile equipment" under MINN. STAT. § 168A.01 subd. 21,[15] as it was not designed for the transportation of persons or property, and its presence on a highway is only incidental to the goal of putting it into active but stationary work at another place.[16] As such, it is excepted from the requirement of issuance of a certificate of title. MINN. STAT. § 168A.03(7).[17]

This conclusion both defeats the Plaintiff's first alternate argument—as there would have been no legally-required certificate of title for the screener on which to perfect a security interest in the first place—and establishes the first element of a mobile good.

On the second element of a mobile good, there is no credible argument that the screener is not "mobile," in the sense of being readily capable of being moved from place to place. This is clearly an issue of fact. The screener is built on a bed similar to that of a trailer; wheels, hook-up capacity, and road safety equipment are all incorporated into its very design. While in the Debtor's ownership, it was readily and effectively moved, for both repairs and active use.

---

14. This statute defines "vehicle" as

 ... every device in, upon, or by which any person or property is or may be transported or drawn upon a highway, excepting devices moved by human power or used exclusively upon stationary rails or tracks, but including motorized bicycles as defined in [MINN. STAT. §] 168.01, subdivision 27.

15. This statute sets forth the definition:

 "Special mobile equipment" means every vehicle not designed or used primarily for the transportation of persons or property and only incidentally operated or moved over a highway, including but not limited to: Ditch digging apparatus, well boring apparatus, moving dollies, sawing machines, corn shellers, and road construction and maintenance machinery such as asphalt spreaders, bituminous mixers, bucket loaders, tractors other than truck tractors, ditchers, leveling graders, finishing machines, motor graders, road rollers, scarifi-ers, earth moving carryalls and scrapers, power shovels and drag lines, and self-propelled cranes and earth moving equipment. The term does not include travel trailers, dump trucks, truck mounted transit mixers, truck mounted feed grinders, or other vehicles designed for the transportation of persons or property to which machinery has been attached.

16. Given its use for the preparation of gravel, a key material for underlayment and roadbed, the screener also qualifies as "road construction and maintenance machinery"——one of the statute's enumerated examples of "special mobile equipment."

17. This statute's directive is simple:

 The registrar shall not issue a certificate of title for:
 . . .
 (7) special mobile equipment . . .

 There is, however, a closer contest on the last element under MINN. STAT. § 336.9–103(3)(A), the requirement that the screener be "of a type normally used in more than one jurisdiction." This element requires the court to gauge the importance of ready mobility to the utility of the particular good, as evidenced by the good's "inherent characteristics." *In re Varsity Sodding Service*, 139 F.3d 154, 157 (3d Cir.1998). The type of good involved—presumably defined by its composition and use—is an important factor. *In re Dennis Mitchell Industries, Inc.*, 419 F.2d 349, 358 (3d Cir.1969).[18] The Court must also determine the pattern of movement of the good in its "normal" use, by all persons, as a matter of general business practice and in light of the type of the good. *In re Minnesota Utility Contracting, Inc.*, 101 B.R. 72, 79 (Bankr.D.Minn., 1989), *rev'd in part on other grounds*, 110 B.R. 414. The actual movement of the good by the debtor itself, as an historical matter, is not the pivotal consideration. *In re Minnesota Utility Contracting, Inc.*, 101 B.R. at 79; also 110 B.R. at 423.

 The Defendant, of course, had the burden of production of evidence on the mobile goods exception that it asserts, including the normal-use element. *In re Minnesota Utility Contracting, Inc.*, 101 B.R. at 79; also 110 B.R. at 423. The Plaintiff argues that the Defendant's evidence of other owners' usage does not meet this burden, as it goes to only three such units. To the contrary, even in isolation this is some evidence, of some substance, that suggests a range of patterns of use among owners, in which transport between jurisdictions for multi-site operation is as "normal" as leaving the screener at one production facility. In isolation, the consummation of the sales tax exemption suggests a single-jurisdiction usage, and one limited to Minnesota, but that is not determinative. Neither is the actual usage by the Debtor, though that arguably cuts to the opposite result. The broader-based pattern of usage by fellow owners under ordinary conditions more directly bears on the issue, and to the Defendant's benefit. So, too, does the opinion of Carlson's controller, experienced as he was in meeting the needs of users of heavy equipment in the Debtor's industry and related ones: it is "not unusual" for a customer to use this sort of screener in a state other than the one in which it has its headquarters.

 In the last instance, though, the case law indicates that normal use is to be determined in something like an "objective" inquiry: identifying the inherent utility of the good, and the logical ways of maximizing that by using its essential characteristics. Here, the good is of very sturdy construction, both to perform its basic function of material processing and to withstand the stresses of highway transit. Its means for transportability are built right into it, as essential components. The substances that the screener was built to process are all voluminous and heavy; it makes much more economic sense to transport the unit to different material sites than it does to transport material in bulk from far-flung sites to the unit. Finally, most of its intended and most logical

---

**18.** The *Dennis Mitchell Industries* court stated that

> [w]hile the enumeration of certain types of goods in [the general UCC's corollary to MINN. STAT. § 336.9–103(3)(a)] is not intended to be all inclusive, it seems clear that the test for mobile goods turns on the type of goods involved and not on their actual use in or transportation between more than one jurisdiction.

419 F.2d at 358. The wording of this observation is somewhat unfortunate, as it suggests that only physical topology bears on the "normal use" element, and always in a pivotal way. The quoted language is better read as making a distinction in the nature of the required finding: between one going to general or industry-wide use, and one going to past usage specific to the debtor in the case before the court. The Third Circuit's rationale in its later *Varsity Sodding* opinion is not inconsistent with this interpretation, though the *Varsity Sodding* court relied heavily on the patterns of use by the debtor before it in making its fact determinations on "normal use."

**360**

users—road builders, landscapers, and sand and gravel producers—do business across great distances, and over state lines. As it has in fact been exploited by two of Carlson's customers, the screener is indeed normally used in more than one jurisdiction.

The Defendant has met the last element of the mobile-goods exception. It necessarily follows that the Defendant was not bound to perfect its security interests in Iowa, where the screener came to a long-term rest at the Debtor's Pacific Junction site. The filing in Minnesota, the jurisdiction where the Debtor maintained its chief executive office, and hence where the Debtor was located, MINN. STAT. § 336.9–103(3)(d),[19] was sufficient to perfect its security interest under MINN. STAT. § 336.9–103(3)(b).[20]

 The Plaintiff's case fails on a single element: a transfer of the Debtor's property via the perfection of the Defendant's security interest did not take place within the proximity period of § 547(b)(4)(A). The Plaintiff is not entitled to avoid the Defendant's security interest against the screener. Because the underlying security interest was not avoidable, the Debtor's pre-petition payments to the Defendant were made on account of a fully-secured debt and are not avoidable under § 547(b) either. Finally, since the Plaintiff's theory as to the Debtor's post-petition payments rested entirely on an assumed avoidability of the security interest, he has no right to avoid those transfers either; he has not pointed to any other aspect of the payments that would support a holding that they were not au-

thorized under the Bankruptcy Code, as 11 U.S.C. § 549(a)(2)(B) would require for him to prevail.[21]

### ORDER FOR JUDGMENT

On the Findings of Fact and Conclusions of Law just made,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. As of July 9, 1998, the date on which the Debtor filed for reorganization under Chapter 11, the Defendant held a valid and properly-perfected security interest against one Multitek Multi-screen Model 650 DMC, with an 80–horsepower John Deere engine, Serial No. 5020896, then in the possession and ownership of the Debtor.

2. The security interest described in Term 1 is not avoidable at the Plaintiff's insistence under color of 11 U.S.C. § 547(b).

3. The payments that the Defendant received from the Debtor on account of its status as secured party against the equipment described in Term 1 in the 90 days preceding July 9, 1998, are not avoidable at the Plaintiff's insistence under color of 11 U.S.C. § 547(b).

4. The payments that the Defendant received from the Debtor on account of its status as security party against the equipment described in Term 1 between July 9, 1998 and January 15, 1999, are not avoidable at the Plaintiff's insistence under 11 U.S.C. § 549(a).

19. This statute provides, in pertinent part:
A debtor shall be deemed located at the debtor's place of business if the debtor has one, at the chief executive office if there is more than one place of business, otherwise at the debtor's residence.

20. As to multiple-state transactions, this statute provides:
The law (including the conflict of laws rules) of the jurisdiction in which the debt-

or is located governs the perfection and the effect of perfection or nonperfection of the security interest.

21. Indeed, as the Plaintiff made almost all the post-petition payments himself while he was operating the Debtor's business, there is every reason to regard them as having been made in the ordinary course of business, and hence Code-authorized under 11 U.S.C. § 363(c)(1).

LET JUDGMENT BE ENTERED AC-
CORDINGLY.